UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE  DIVISION

| | | |
|---|---|---|
| SHELIA SCHMITT, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 3:06-cv-99-RLY-WGH |
| | ) | |
| BEEKAY DEVELOPMENT, LLC; | ) | |
| ESSBEE GOLF LLC; STANPHYL | ) | |
| COMPANY, LLC; BERGER REALTY | ) | |
| GROUP; QUAIL COMMUNITY | ) | |
| CROSSING, LLC; and BRG Quail, LLC, | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT and
PLAINTIFF'S REQUEST FOR ORAL ARGUMENT**

On May 17, 2004, Plaintiff, Shelia Schmitt ("Plaintiff"), purchased a new home in

a subdivision/golf community known as Quail Crossing located in Warrick County,

Indiana.  By the Spring of 2006, the house unexpectedly sank several inches into the

ground, and the house was condemned.  The Indiana Department of Natural Resources

("IDNR") offered its opinion that Plaintiff's house sank from mine subsidence.  On May

11, 2006, Plaintiff filed a three-count Complaint in the Warrick Superior Court against

the builder of the home, the developer, and a number of other corporate entities, for the

damage caused by mine subsidence.  On June 16, 2006, Defendants removed the case to

this court on grounds of diversity jurisdiction.  On October 30, 2007, Defendants filed the

instant motion for summary judgment, and on December 17, 2007, Plaintiff filed a

1

request for oral argument with respect to Defendants' motion for summary judgment.  For the reasons set forth below, the court now finds that Defendants' Motion for Summary Judgment should be **GRANTED** in part, and **DENIED** in part, and the Plaintiff's Motion for Oral Argument should be **DENIED**.

## I.      Preliminary Matter

As noted above, Plaintiff filed a request for oral argument "to answer any questions the court may have with regard to the issues in this matter which are predominately Indiana state law claims."  (Plaintiff's Request for Oral Argument at 1). The court has read and reviewed the parties' briefs, the designated evidence, and the applicable law, and finds that oral argument is not warranted in this case.  Accordingly, Plaintiff's Request for Oral Argument is **DENIED**.

## II.     Background Facts of Defendants' Motion for Summary Judgment

On May 16, 2004, Plaintiff purchased a home located at 293 Persimmon Circle in a subdivision called "Quail Crossing" near Boonville, Indiana. (Deposition of Shelia Schmitt ("Plaintiff Dep.") at 19; Plaintiff's Ex. 1).  In March 2006, Plaintiff's home was inspected by the Warrick County Building Commissioner, Michael L. Winge, who determined that the foundation to Plaintiff's home "broke" and that the home was not safe for habitability.  (Affidavit of Michael L. Winge ("Winge Aff.") ¶ 5).  He thereafter ordered the utilities turned off.  (*Id*.).  The parties agree that the damage to Plaintiff's house was caused by mine subsidence.

### A.     The Parties

Defendant, BRG Quail, a home builder, built and sold the finished house to

Schmitt as a spec home.  (Deposition of Steven Berger ("Berger Dep.") at 17-18).

Defendant, Beekay Development, developed Phase III of the subdivision, where

Plaintiff's home is located.  (Deposition of Craig Wood ("Wood Dep.") at 20-21;

Affidavit of Jacqueline A. Sawyer ("Sawyer Aff.") ¶ 3)).

The other named defendants in this action – Essbee Golf, LLC ("Essbee Golf"),

Stanphyl Company, LLC ("Stanphyl Company"), Berger Realty Group ("Berger Realty"),

and Quail Community Crossing, LLC – are corporations that were not directly involved

with developing Phase III of the Quail Crossing subdivision nor directly involved with

building Plaintiff's home.  (*Id*. ¶¶ 5-9).  Essbee Golf is the owner of Beekay

Development, LLC, and Stanphyl Company, LLC, owns an interest in Essbee Golf.  (*Id*. ¶

9).  In addition, both Michael and Steven Berger, among others, were members of

Stanphyl Company, and were shareholders, directors, and officers of Berger Realty.

(Plaintiff's Ex. 2).

### B.     Defendants' Knowledge of the Possibility of Mine Subsidence

According to the IDNR, an abandoned underground coal mine called the "Korff

Mine," which was mined between 1909 and 1934, is located in the vicinity of the

subdivision.  (Deposition of Joseph Lorenzo ("Lorenzo Dep.") at 4-6).  BRG Quail and

Beekay Development knew about the existence of the mine; however, all that they knew

was that there had been mining in the area of the subdivision.  This general knowledge

was gleaned from two general sources of information, which are discussed below.

In April of 1996 and August of 1997, during Phase I of development of the subdivision, environmental impact reports were prepared by Sub-Tech, Inc., and Koester Environmental Services, Inc. (Plaintiff's Exs. 3-4). These reports reflect that there had been mining in the general vicinity of the subdivision. They do not, however, offer an opinion about the effect of the mining on the Site, the likelihood or unlikelihood of mine subsidence, or whether the mining rendered the property unsuitable for residential development. Indeed, the Sub-Tech report specifically states, "Geological hazards that may exist due to oil and gas production and/or mining activities in the Site have not been investigated." (Plaintiff's Ex. 3).

In that same general time frame, when the subdivision was being graded for roads by a prior developer, two iron pipes were discovered that the IDNR identified as likely being associated with the Korff Mine. (Wood Dep. at 8-10; Lorenzo Dep. at 4-6). There is no evidence that the IDNR provided any elaboration on the scope or extent of the mining in the area of the subdivision, that IDNR told anyone they could not build over the mine, or that there was a risk of mine subsidence. (Lorenzo Dep. at 6-9, 50-51). Rather, the IDNR instructed the developers how to cap the pipes. (*Id*. at 39). According to the IDNR, there had never been any other reports of subsidence from the Korff Mine prior to the events at Plaintiff's home. (*Id*. at 39).

Indeed, Defendants did not know the extent of the mining nor where the mine works were located. (*Id*. at 35; Deposition of John Ebach ("Ebach Dep." at 20-22). In

4

particular, Defendants did not know that there had been mining under the lot where Plaintiff's house is located.  (Berger Dep. at 48).  Defendants, which are Michigan corporations, were not familiar with the concept of mine subsidence when BRG Quail built the home.  (Ebach Dep. at 22).  It was not until the subsidence occurred at Plaintiff's house that BRG Quail first became acquainted with the concept of mine subsidence. (*Id.*).

### C.    Information on the Existence and Location of the Mine

The IDNR maintains maps of known underground mines. (Lorenzo Dep. at 37).  In addition, the IDNR provides information on the location of abandoned mines to members of the public who are buying new homes.  (*Id.* at 51-52).  For some abandoned mines, only the outline or general area of the mine is known.  For others, the IDNR has information and maps actually depicting the rooms and pillars.  (*Id.* at 36-38).  The IDNR's map for the abandoned Korff Mine shows only the general outline of the mine. (*Id.* at 38).  According to the IDNR, these maps have been available to the public since the 1980s and many insurance companies have copies of the abandoned mine maps for use in connection with mine subsidence insurance policies.  (*Id.* at 13).

The Indiana Geological Survey, in particular, has an internet website that is open to the public and allows anyone accessing the site to view maps of southwest Indiana showing the outlines of abandoned mines.  (*Id.* at 31-33).  This information has been available since at least the last quarter of 2001.  (*Id.* at 34; Affidavit of Licia Weber ("Weber Aff.") ¶ 3).

### D.      Plaintiff's Reliance on her Real Estate Agent

Plaintiff had her own realtor and relied on him to guide her through the process of purchasing her home.  (Plaintiff Dep. at 15-16; 33-34).  Her realtor drafted the purchase agreement on the home, but Plaintiff did not read it before signing.  (*Id*. at 32-33).  Prior to closing, Plaintiff had no conversations with anyone at BRG Quail other than during an orientation tour of the home with John Ebach of BRG Quail after Plaintiff had agreed to buy the house.  (*Id*. at 39-41).

The purchase agreement prepared by Plaintiff's realtor contained a paragraph disclosing mining and the availability of mine subsidence insurance.  (Amended Complaint, Ex. A, § 21B).  Specifically, the purchase agreement provided that "underground mining has occurred in Indiana, and Buyers are advised of the availability of subsidence insurance." (*Id*.).  Plaintiff testified that she did not have any conversations with her realtor about this paragraph or what it meant.  (Plaintiff Dep. at 37).

The purchase agreement drafted by Plaintiff's realtor also contains a provision, paragraph 24, that states:

> Consult your advisors: Buyer and Seller acknowledge that they have been advised that, prior to signing this document, they may seek the advice of an attorney for the legal or tax consequences of this document and the transaction to which it relates.  In any real estate transaction, it is recommended that you consult with a professional, such as a civil engineer, environmental engineer, or other person with experience in evaluating the condition of the Property.

(Amended Complaint, Ex. A).  It is undisputed that according to Plaintiff, she did not consult with anyone besides her realtor before purchasing the property.  (Plaintiff Dep. at

6

37-38).  Plaintiff did not have an inspection done prior to closing, and the form prepared by her realtor indicated that no residential real estate disclosure was required.  (*Id*. at 34, 36).

### E.    Plaintiff's Reliance on Her Insurer

Plaintiff arranged to have homeowner's insurance prior to closing; however, she did not purchase mine subsidence insurance.  (Plaintiff Dep. at 46-48).  In any event, by the time of the subsidence event at her home almost two years later, Plaintiff's homeowner's insurance was cancelled due to nonpayment. (*Id*. at 49-51).

## III.   Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In deciding whether a genuine issue of material fact exists, the court views the evidence and draws all inferences in favor of the nonmoving party.  *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).  However, when a summary judgment motion is made and supported by evidence as provided in Rule 56(c), the nonmoving party may not rest on mere allegations or denials in its pleadings but "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P.

56(e).

## IV.   Discussion

### A.   Named Defendants, Essbee Golf, Stanphyl Company, Berger Realty and Quail Community Crossing

Plaintiff has sued, in addition to the home builder, BRG Quail, and the owner of the property, Beekay Development, four other corporate defendants – Essbee Golf, Stanphyl Company, Berger Realty and Quail Community Crossing.  The only relationship among these four other corporate defendants to the transaction at issue is either through an ownership interest in BeeKay or through the fact that the entities have common owners.   Undeterred, Plaintiff argues that, "The interrelationship of the parties dedicated to a project with a profitable goal may be held liable under tort theories."  Neither Plaintiff's broad statement, nor the cases cited, are sufficient to establish that corporate separateness may be ignored to impose liability.

The general rule is that a corporation will not be held liable for the acts of its subsidiaries.  *Greater Hammond Cmty. Svcs., Inc. v. Mutka*, 735 N.E.2d 780, 784 (Ind. 2000).  Parent and subsidiary corporations are presumed separate.  *Id*.  However, "[t]he legal fiction of a corporation may be disregarded 'where one corporation is so organized and controlled and its affairs so conducted that it is a mere instrumentality or adjunct of another corporation.'" *Oliver v. Pinnacle Homes, Inc.*, 769 N.E.2d 1188, 1191 (Ind. Ct. App. 2002) (quoting *Smith v. McLeod Distrib., Inc.*, 744 N.E.2d 459, 462 (Ind. Ct. App. 2000)).  "While no one talismanic fact will justify with impunity piercing the corporate

veil, a careful review of the entire relationship between various corporate entities, their directors and officers may reveal that such an equitable action is warranted." *Stacey-Rand, Inc. v. J.J. Holman, Inc.*, 527 N.E.2d 726, 728 (Ind. Ct. App. 1988).

In deciding whether to pierce the corporate veil, the moving party must present evidence showing: (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice, or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form. *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994). In a case such as this, where a plaintiff seeks to hold one corporation liable for the other closely-held corporation's debt under an alter ego theory, the court may consider additional factors, including whether the two corporations have: (1) similar corporate names; (2) common principal officers, directors, and employees; (3) similar business purposes; and (4) the same offices, telephone number, and business cards. *Smith*, 744 N.E.2d at 463.

Here, Plaintiff failed to offer any evidence with respect to any of the *Aronson* or *Smith* factors listed above. All she has done is recite the ownership of the various entities. Such evidence is insufficient to oppose summary judgment. *See, e.g., Oliver*, 769 N.E.2d at 1193-95 (upholding summary judgment against plaintiff's claim to disregard the corporate form); *see also O'Brien v. Watco Contract Switching, Inc.*, 802 N.E.2d 999,

1007-08 (Ind. Ct. App. 2004) (evidence of the corporate ownership of a subsidiary and overlapping officers and directorates is insufficient, in and of itself, to impose liability on the parent for conduct of the subsidiary).

To the extent that Plaintiff asserts a claim that the Defendants were combined in a joint venture, that claim is similarly unavailing.  In order for a joint venture to exist under Indiana law, the parties must be bound by an express or implied contract providing for "'(1) a community of interests, and (2) joint or mutual control, that is, an equal right to direct and govern the undertaking, that binds the parties to such an agreement.'" *Inland Steel v. Pequignot*, 608 N.E.2d 1378, 1382 (Ind. Ct. App. 1993) (quoting *Boyer v. First Nat'l Bank of Kokomo*, 476 N.E.2d 895, 897-98 (Ind. Ct. App. 1985)).  A joint venture differs from a partnership in that a joint venture contemplates only one transaction.  *Id.*  A joint venture must provide for the sharing of profits.  *Id.*

Here, Plaintiff fails to support her joint venture theory with any evidence tending to show that Essbee Golf, Stanphyl Company, Berger Realty Group, or Quail Community Crossing formed an express or implied contract providing for a "community of interests," "an equal right to govern the undertaking," and the sharing of profits.  The fact that these four corporate entities may have an ownership interest in BRG Quail or Beekay Development is insufficient to support a finding of a joint venture to defeat corporate separateness.  *See Byrd v. E.B.B. Farms*, 796 N.E.2d 747, 754 (Ind. Ct. App. 2003) (finding that the relationship between farm owner, operator, and manager was not a joint venture).

10

In conclusion, there has been no showing that would justify ignoring the corporate forms to find liability against Essbee Golf, Stanphyl Company, Berger Realty Group, or Quail Community Crossing.  These entities are therefore entitled to summary judgment.

**B.      Count I, Duty to Disclose**

In Count I of her Amended Complaint, Plaintiff alleges that Defendants[1] had a duty to disclose that there had been mining in the area of the subdivision.  Plaintiff claims that  "[t]his count essentially asserts liability under a theory of constructive fraud." (Plaintiff's Response at 7).   Plaintiff is wrong.  On November 17, 2007, the court denied Plaintiff's Motion to Amend her Complaint to include a new claim for fraud/constructive fraud.  Even if Plaintiff's Count I were construed to state a claim for constructive fraud, however, the claim would fail as a matter of law.

"Constructive fraud arises by operation of law when there is a course of conduct which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud."  *Wells v. Stone City Bank*, 691 N.E.2d 1246, 1250 (Ind. Ct. App. 1998).  "The elements of constructive fraud are: (1) a duty existing by virtue of the relationship between the parties; (2) representations or omissions made in violation of that duty; (3) reliance thereon by the complaining party; (4) injury to the complaining party as a proximate result thereof; and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party."  *Id.*; *see also Rice v. Strunk*, 670 N.E.2d 1280,

---

[1] The court will refer to the remaining corporate Defendants in this action,  Beekay Development and BRG Quail, by either their corporate names or, collectively, as "Defendants."

1284 (Ind. 1996).  The law infers constructive fraud by virtue of the relationship of the

parties and the circumstances surrounding them.  *Mullen v. Cogdell*, 643 N.E.2d 390, 401

(Ind. Ct. App. 1994).

With respect to a buyer-seller relationship, constructive fraud may arise where one

party is "in the unique possession of knowledge not possessed by the other" and thus

"enjoy[s] a position of superiority over the other."  *Id*.  A party does not have "superior

knowledge," however, where the information at issue is readily available to the

complaining party.  *Lovold Co. v. Galyan's Brownsburg, Inc.*, 764 N.E.2d 281, 287 (Ind.

Ct. App. 2002); *see also Stucco Cotton Duster Co. v. Comet Elec. Co.*, 95 Ind. App. 672,

680, 180 N.E. 185, 187-88 (1932) (recognizing no liability when information is as

accessible to one party as to the other and the truth may be ascertained by the exercise of

reasonable diligence).

In this case, the information regarding the presence of underground mines was

readily available to Plaintiff.  Both the IDNR and the Indiana Geological Survey made the

information available to the public; in fact, the Indiana Geological Survey posts such

information on a publicly available website.

Moreover, Plaintiff did not have a special relationship with Beekay Development

and BRG Quail that gave her a right to rely on them to disclose this publicly available

information.  Plaintiff testified that she did not have any negotiations with either

Defendant prior to purchasing the house.  In addition, although Indiana courts have held

that there is a duty to disclose if the buyer makes specific inquiries about "the condition

on, the qualities of, or the characteristics of the property," *Fimble v. DeClark*, 695 N.E.2d

125, 127 (Ind. Ct. App. 1998), that did not happen here.  Plaintiff did not ask any

questions of Beekay Development or BRG Quail prior to closing.  Rather, she relied on

her own realtor in formulating the deal.

Because neither Beekay Development nor BRG Quail had superior knowledge of

the existence of the Korff Mine, nor made representations that they failed to live up to,

Plaintiff's claim of constructive fraud must fail as a matter of law.  Defendants' Motion

for Summary Judgment on Count I of Plaintiff's Amended Complaint is therefore

**GRANTED**.

### C.    Count II, Breach of the Implied Warranty of Habitability Against BRG Quail and Beekay Development

#### 1.    BRG Quail

In Count II, Plaintiff brings a claim for breach of the implied warranty of

habitability against BRG Quail, the builder-vendor in this case.  The implied warranty of

habitability "warrants that a house will be free from defects which substantially impair

the use and enjoyment of that house."  *Choung v. Iemma*, 708 N.E.2d 7, 12 (Ind.Ct.App.

1999).  The warranty is "implied-in-fact in the . . . parties' sales contract."  *Johnson v.

Scandia Assoc., Inc.*, 717 N.E.2d 24, 27 (Ind. 1999)  The warranty was first applied to

initial purchasers in *Theis v. Heuer*, 280 N.E.2d 300, 306 (Ind. 1972), was extended to

subsequent purchasers (for latent or hidden defects) in *Barnes v. Mac Brown and Co.,

Inc.*, 342 N.E.2d 619, 620-21 (Ind. 1976), and later extended to residential leaseholds in

13

*Breezewood Management Co. v. Maltbie*, 411 N.E.2d 670, 675 (Ind. Ct. App. 1980).  The rationale for the implied warranty is that the average home-buyer is not in an equal bargaining position with the builder-vendor; thus, the average homeowner should "be able to rely upon the expertise and skill of the builder[-vendor] that the house is reasonably fit for its intended use."  *Kissel v. Rosenbaum*, 579 N.E.2d 1322, 1325 (Ind. Ct. App. 1991); *Vetor v. Shockey*, 414 N.E.2d 575, 577 (Ind. Ct. App. 1980); *Hesson v. Walmsley Construction Co.*, 422 So.2d 943, 945 (Fla. App. 1982) ("As noted, the builder-vendor is in a better position than the buyer to investigate the quality of the land to support the house . . . . Moreover, we believe that by placing the risk of furnishing the buyer a functional home on the builder-vendor, the builder will be encouraged to exercise greater care in selection of building sites."); *Elderkin v. Gaster*, 288 A.2d 771, 777 (Pa. 1972) ("As between the builder-vendor and the vendee, the position of the former, even though he exercises reasonable care, dictates that he bear the risk that a home which he has built will be functional and habitable in accordance with contemporary community standards.").

    It is undisputed that the structural damage to Plaintiff's home was caused by mine subsidence.  The issue, then, is whether the implied warranty covers structural defects[2]

---

    [2]  In interpreting the scope of the implied warranty of habitability under Indiana law, the court finds persuasive Indiana's New Home Construction Statute, codified at Indiana Code § 32-27-2-1 *et seq*. On its face, the New Home Construction Statute operates to assure each Indiana homeowner that certain basic, minimum  warranties apply to each newly constructed home. Indiana's New Home Construction Statute provides that the implied warranties may not be disclaimed unless certain express, basic, and minimum warranties are extended by the builder regarding the construction of a house.  *See* Ind. Code § 32-27-2-9 ("A builder may disclaim all

caused by mine subsidence.  BRG Quail maintains that the implied warranty does not

cover this type of structural damage because it could not have predicted that mine

subsidence would negatively affect the structure of her particular house.  (Defendants'

Reply at 12) ("It is undisputed that the damage to the house was caused by mine

subsidence, which was not caused by BRG Quail or Beekay and which could not be

predicted.").  BRG Quail misapprehends the nature of a warranty.  "A warranty is a

promise relating to past or existing fact that incorporates a 'commitment by the promisor

that he will be responsible if the facts are not as manifested.'"  *Johnson,* 717 N.E.2d at 28

(citing 1 Samuel Williston, *A Treatise on the Law of Contracts* § 1:2, at 10 (Richard A.

Lord, ed., 4th ed. 1990)).  Thus, BRG Quail, as the builder-vendor, impliedly warranted –

─────────────────────

implied warranties only if all of the following conditions are met. . . .").  Significantly, one of the
express, basic, minimum warranties set forth in the New Home Construction Statute is as
follows:

> (a) In selling a completed new home, and in contracting to sell a new home to be
> completed, the builder may warrant to the initial home buyer the following:
>
> . . .
>
> (4) During the ten (10) year period beginning on the warranty date, the
> new home will be free from major structural defects.

Ind.Code. § 32-27-2-8.  "Major structural defect" is defined as "actual damage to the load
bearing part of a new home, including actual damage due to: (1) subsidence; . . . ."  Ind.Code §
32-27-2-3.

Given the legislative determination that a builder-vendor cannot disclaim the implied
warranties without providing the express warranties stated in Indiana Code § 32-27-2-8, it would
be an anomaly to conclude that a builder-vendor can effectuate a disclaimer of the express
warranties (including that for subsidence) by opting to extend only the implied warranties.  Thus,
to the extent this court were to hold that Indiana's implied warranty of habitability does not
contemplate "structural defects caused by mine subsidence," such a holding would be at odds
with Indiana's statutory scheme for builder-vendor warranties.

indeed, it promised – that the Plaintiff's home would be structurally fit for its intended purpose, habitation.  It is undisputed that Plaintiff's home was condemned by the Warrick County Building Commissioner, Michael Winge.  (Winge Aff. ¶ 5).  Plaintiff's home, therefore, was not "free from defects which substantially impair the use and enjoyment of [her] house." *Choung*, 708 N.E.2d at 12.  Therefore, Plaintiff has properly raised a genuine issue of material fact as to whether BRG Quail breached the implied warranty of habitability.  Accordingly, Defendants' Motion for Summary Judgment on Count II of Plaintiff's Amended Complaint with respect to BRG Quail must be **DENIED**.

### 2.    Beekay Development

Count II also includes Beekay Development, the developer in this case.  A professional developer may be held liable under the implied warranty of habitability if he sells lots in areas that are unsuitable for building homes.  *Jordan v. Talaga*, 532 N.E.2d 1174, 1185-86 (Ind.Ct.App. 1989).  Beekay Development, relying on *Jordan*, argues that Beekay Development cannot be liable in this case because "there is no way to predict that mine subsidence would occur, and there is no evidence that a reasonable developer would have done anything different than Beekay [Development]."  (Defendant's Reply at 13).

In *Jordan*, professional developers Jordan and Baker made improvements to raw property to facilitate development of a subdivision.  *Id*. at 1178.  A natural channel of water flowed through the subdivision and drained into a creek.  *Id*.  Despite the existence of the natural water channel, Jordan and Baker believed that enlarging an existing swale on the edge of the Talaga's eventual property would adequately handle the water drainage

16

issue.  *Id*.  Jordan and Baker sold the property to a homebuilder, who eventually sold the

finished product to the Talagas in 1975.  *Id*.  The following year, the Talagas experienced

flooding in their backyard.  *Id*.  For the next nine years, this and like experiences

followed.  *Id*. at 1179.  The Talagas eventually filed suit against developers Jordan and

Baker.  *Id*.

In affirming the jury verdict holding Jordan and Baker liable, the Indiana Court of

Appeals reasoned:

> The facts and circumstances of the present case are particularly appropriate
> for the imposition of an implied warranty of habitability.  Jordan and Baker
> did more than sell raw land.  They platted, subdivided, and engineered
> considerable improvements for Sandridge Estates.  They put in the sanitary
> sewers, the storm sewers, and streets; they rough graded the lots all for the
> express purpose of facilitating the building of homes.
> Jordan and Baker are professionals in real estate development and other
> aspects of real estate business. . . . As the developers of Sandridge with
> knowledge of the water channel problem, Jordan and Baker were in the best
> position to leave the lot in question undeveloped.  As the developers of
> Sandridge, they are in the best position to absorb the loss attributable to the
> latent, undisclosed defect in the real estate they sold.

*Id*. at 1185-86.

While knowledge of the potential flooding issue with respect to the Talaga's

property was an important factor to the *Jordan* Court, it was not a material factor in its

decision.  Most notably, the *Jordan* Court relied on *Hinson v. Jefferson*, 215 S.E.2d 102

(N.C. 1975).  In *Hinson*, the property at issue was subject to restrictive convenants that

limited its use to the construction of a residential home.  *Id*. at 104.  At the time the

developer sold the property, neither he nor the plaintiff knew that the soil was unsuitable

for the installation of a sewer or septic system. *Id*. at 105. Nevertheless, the Supreme Court of North Carolina held that the developer breached an implied warranty of habitability arising out of the restrictive covenants because the land was entirely valueless for the only purpose allowed under the restrictive covenants – residential homebuilding. *Id*. at 111. "The basic and underlying principle of *Hartley* [*v. Ballou*, 209 S.E.2d 776 (1979)] is a recognition that in some situations the rigid common law maxim of caveat emptor is inequitable. We believe this is one of those situations." *Id*.

The *Jordan* Court also relied upon *Rusch v. Lincoln-Devore Testing Lab., Inc.*, 698 P.2d 832 (Colo. App. 1984). In that case, plaintiffs purchased an unimproved lot on a site of a manmade fill from the defendant developers. *Id*. at 833. Plaintiffs hired a soil engineering firm to conduct a soil inspection of the site and recommend a foundation design, and in reliance on the report, built a home on the subject property. *Id*. Soon after the house was complete, Plaintiffs' house suffered structural damage due to subsidence and lateral movement of the soil beneath the home. *Id*. Plaintiffs sued the developer and the soil engineering firm, and a jury returned a verdict in their favor. *Id*. at 834. On appeal, the appellate court issued the following holding, which the *Jordan* Court quoted:

> Accordingly, we hold that if land is improved and sold for a particular purpose, if vendor has reason to know that the purchaser is relying upon the skill or expertise of the vendor in improving the parcel for that particular purpose, and the purchaser does in fact so rely, there is an implied warranty that the parcel is suitable for the intended purpose.

*Jordan*, 532 N.E.2d at 1174[3] (quoting *Rusch*, 698 P.2d at 835).

What can be gleaned from *Jordan* and its related cases, then, is that where a professional developer improves land and sells the land for the express purpose of residential homebuilding, the developer impliedly represents that the land is suitable for the residential purpose for which it is sold.  As a professional developer, Beekay Development is in "the best position to absorb the loss attributable to the latent, undisclosed defect in the real estate [it] sold."  *Jordan*, 532 N.E.2d at 1185-86.

Here, Beekay Development developed Phase III of the subdivision, where Plaintiff's home is located, "for the express purpose of facilitating the building of homes."  *Id*. at 1185.  Beekay Development, a professional development company which sold the property with the implied representation that the land was suitable for residential homebuilding, "[is] in the best position to absorb the loss attributable to the latent, undisclosed defect in the real estate [it] sold."  *Id*. at 1185-86.   Plaintiff has properly raised a genuine issue of material fact as to whether Beekay Development breached the implied warranty of habitability.  Accordingly, Defendants' Motion for Summary Judgment on Count II of Plaintiff's Amended Complaint with respect to Beekay Development must be **DENIED**.

---

[3] The Indiana Court of Appeals later determined that a plaintiff's reliance on a developer's skill or expertise is not an essential element in a claim for breach of the implied warranty of habitability claim under Indiana law.  *See Smith v. Miller Builders, Inc.*, 741 N.E.2d, 731, 743 (Ind.Ct.App. 2000).

### D.      Count III, Breach of the Warranty of Quiet Enjoyment

In Count III of Plaintiff's Amended Complaint, she brings a claim for breach of the warranty of quiet enjoyment under the warranty deed.  Quiet enjoyment is a covenant of title, as are the warranties of seisen, right to convey, freedom from encumberances, and defense of title as to all claims.  *Windell v. Miller*, 687 N.E.2d 585, 588 (Ind. Ct. App. 1997).  "Quiet enjoyment" means "the possession of real property with the assurance that the possession will not be disturbed by a superior title."  BLACK'S LAW DICTIONARY  435 (7th ed. 2000).  In this case, Plaintiff is not claiming that she did not receive good title, or that her title is otherwise impaired.  Accordingly, Plaintiff's claim for breach of the warranty of quiet enjoyment fails as a matter of law.  Defendants' Motion for Summary Judgment on Count III of Plaintiff's Amended Complaint is therefore **GRANTED**.

### E.      Plaintiff's Second Amended Complaint

On May 21, 2008, the court granted Plaintiff leave to file a Second Amended Complaint to include an allegation in Count II of breach of the express warranties as contemplated by Indiana's New Home Construction Statute.  In her Second Amended Complaint, filed on May 22, 2008, Plaintiff included new allegations in Count I (in paragraphs 12-14) and a new Count IV.  Plaintiff was not granted leave to include these new allegations.  Accordingly, these new allegations are hereby stricken from her Second Amended Complaint.

## V.      Conclusion

For the reasons set forth above, the Defendants' Motion for Summary Judgment (Docket # 34) is **GRANTED** in part, and **DENIED** in part.  More specifically, Defendants' Motion is **GRANTED** with respect to Counts I and III of Plaintiff's Amended Complaint, and **DENIED** with respect to Count II of Plaintiff's Amended Complaint.  In addition, Plaintiff's Motion for Oral Argument (Docket # 50) is **DENIED** and paragraphs 12-14 of Count I and Count IV are **STRICKEN** from her Second Amended Complaint.


**SO ORDERED** this 3rd  day of July 2008.

_____

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Electronic Copies to:

Abigail B. Cella
ICE MILLER LLP
abby.cella@icemiller.com

Thomas Eugene Mixdorf
ICE MILLER LLP
thomas.mixdorf@icemiller.com

Leslie C. Shively
SHIVELY & ASSOCIATES
shively@sigecom.net